[L. A. No. 2004.   Department Two.—September 11, 1908.]

# FRANK W. JOHNSON et al., Respondents, v. SOUTHERN PACIFIC RAILROAD COMPANY, Appellant.

RAILROADS—SIGNALS—APPROACH OF CROSSING.—The law requiring a railroad train approaching a crossing of a street, road, or highway to give a signal of its approach, applies to all crossings, whether at grade or over or under grade.

ID.—PLEADING—OWNERSHIP OF RAILROAD—PRESUMPTION OF OPERATION —ADMISSION IN ANSWER.—In an action against a railroad company to recover damages for personal injuries occasioned by a train, an admission in the answer that the defendant owned the railroad track and rolling-stock appurtenant to it was sufficient, in the absence of anything to the contrary, to justify the reasonable inference that the particular train occasioning the accident was at the time thereof being operated by the defendant.

ID.—POSSESSION AND OPERATION.—Where it is shown or is admitted by the pleadings, that a corporation was the owner of a railroad in the operation of which a wrong was committed, the presumption is that the road was in its possession and being operated by it at that time.

ID.—LEASE OF RAILROAD—AFTER-ACQUIRED RAILROAD LINE—PAROL EVIDENCE OF LEASE.—A lease by a railroad company of its railroad lines described as then existing, together with the appurtenances thereunto belonging, under which the lessee was obligated to keep the leased property "in good order and condition and repair, operate, maintain, add to and better the same at its own expense," cannot be construed as a lease of an additional line of railroad subsequently constructed or acquired by the lessor at its own expense, and parol evidence is inadmissible to give it such a construction.

ID.—EVIDENCE OF OPERATION—PAROL LEASE.—Evidence that the lessee under such a lease operated the additional railroad line subsequently acquired by the lessor, and accounted to it for the profits, is not of itself sufficient to show a parol lease of such additional line.

ID.—LIABILITY OF OWNER FOR OPERATIONS OF RAILROAD—LEASE BY STATUTORY AUTHORITY.—A railroad company, in the operation of its road, cannot escape responsibility or avoid the discharge of the duties and obligations imposed under its franchise by voluntarily leasing its road to be operated by another company. It can only relieve itself from responsibility for injuries resulting from such operation by showing a lease made to the operating company under statutory authority.

ID.—RELIEF FROM LIABILITY BY LEASE.—In this state, under the act of 1880, a railroad corporation may lease its railroad property to another company and will be relieved from personal liability for any injury resulting merely from the negligent operation and handling

of trains by the lessee. Relief from such liability can only exist where there is proof of a lease made as provided in the act.

Id.—Negligence—Burden of Proof to Escape Liability.—Where the corporation owning a railroad is sued for a wrong committed in the operation of a train, the burden is upon it to show that the train inflicting the injury was under the control and operation of some other company by virtue of the lease of the road. In the absence of such a showing, an erroneous statement by the court in its instructions to the jury to the effect that the defendant admitted the operation of the train, is immaterial.

Id.—Contributory Negligence—Instructions—Evidence.—In an action to recover damages for alleged negligence of the defendant, the court can instruct the jury to return a verdict for the defendant on the ground of the contributory negligence of the person injured only when the evidence conclusively establishes such contributory negligence, and no deductions or inference other than contributory negligence can be drawn by the jury from the evidence. In this case, the evidence is reviewed, and is held not to warrant such an instruction.

Id.—Death of Wife and Mother—Action by Husband and Children—Measure of Damages.—In an action by a surviving husband and children to recover damages for the death of their wife and mother, the husband is entitled to recover the value of the present and future services of the "wife and companion," and the children the value of the mother's "nurture and instruction, moral and physical, and intellectual training," and the jury may award such a lump sum for damages as will fully compensate the plaintiffs, both husband and children, for the pecuniary value to them of the life of the wife and mother.

APPEAL from a judgment of the Superior Court of Santa Barbara County and from an order refusing a new trial. James W. Taggart, Judge.

The facts are stated in the opinion of the court.

Canfield & Starbuck, for Appellant.

Richards & Carrier, for Respondents.

LORIGAN, J.—This action was brought to recover damages from the defendant for the death of the wife of the plaintiff, Frank W. Johnson, and mother of the other plaintiffs, alleged to have been occasioned by the negligence of the defendant in causing one of its trains to approach an overhead crossing without signalling, by reason whereof a horse

that the plaintiff Olin W. Johnson was driving in a buggy, with the deceased, was frightened, ran away, and overturned the buggy. The defense interposed was a general denial and contributory negligence. The action was tried before a jury, which returned a verdict for eight thousand dollars, and from the judgment entered thereon and from an order denying the motion of defendant for a new trial, it appeals.

This case was here before on an appeal from a judgment entered after demurrer to the complaint was sustained. The only point there involved was whether it was necessary under the law to signal the approach of a train at an overhead crossing. We held that the law requiring signals applied to all crossings—at grade or over or under grade—(*Johnson* v. *Southern Pacific R. R. Co.,* 147 Cal. 624, [82 Pac. 306])— and reversed the judgment.

On the present appeal the facts, stated generally, are as follows:—

Some years prior to the accident, the railroad had constructed over Hollister Avenue, in Santa Barbara County, an overhead steel bridge. The avenue runs westerly from the city of Santa Barbara to the village of Goleta, and the railroad in crossing it runs northeasterly. At a point on the avenue and east of the crossing, the natural surface of the grade, and consequently Hollister Avenue itself, originally sloped to the west for about one thousand feet to a creek. On the face of this slope the railroad was laid upon an embankment some eleven or twelve feet above the natural surface of the ground. In order to give headway for teams to pass under the railroad and thus to make the railroad crossing an overhead, instead of a grade crossing, Hollister Avenue had been excavated easterly from a point about four hundred feet east of the creek so as to make a roadbed nearly level to a point about seventy-five feet east of the crossing. This excavation of the avenue made a cut, of which the sides, commencing from the point of excavation on the west, arose gradually as they approached the crossing, where they were about nine feet high, making the railroad at that point about twenty feet above the excavated surface of the avenue. A four-board fence skirted Hollister Avenue on the south. There were other physical conditions along and in the vicinity of Hollister Avenue and the crossing which will be noted later.

On the twenty-fifth day of July, 1901, the plaintiff Olin W. Johnson, then a boy about thirteen years of age, started with his mother to drive eastward in a buggy from their home in Goleta to the city of Santa Barbara, about seven miles distant. The buggy was an ordinary side-barred buggy with the top down. The boy was of a cautious and careful disposition, and he and his mother were familiar with the road and the bridge and had often driven along the road. When they reached a point about four hundred and fifty feet west of the railroad bridge they stopped and listened, looking in both directions for a train. Hearing and seeing none, they proceeded at a slow jog trot towards the crossing. As Mrs. Johnson and her son were approaching the crossing they were constantly looking to see if any train was approaching, and seeing or hearing none, started to drive under the bridge, when for the first time they heard the rattle of an approaching train on the track above. This train consisted of a large number of ballast cars and was engaged in getting ballast for a newly constructed line change in the railroad between Santa Barbara and Ventura. It was proceeding from Irma, a station about three quarters of a mile east from the crossing, and was rolling or drifting without steam down grade towards the crossing. No signal or warning of any character was being given of its approach. At the noise of the train the horse immediately took fright, became unmanageable, galloped from under the bridge, struck the buggy upon the side of the cut, tipping it over, throwing out both Mrs. Johnson and her son. The latter was slightly injured; the former was killed.

At the close of the evidence for plaintiffs, the defendant moved for a nonsuit on the ground that there was no evidence in the case connecting defendant with the accident. This was based upon the theory that it was made an issue under the pleadings whether the train which occasioned the accident was at the time thereof being operated by the defendant, and that plaintiff had failed to prove that it was. Respondents claim that, considering the entire answer of defendant, no such issue was raised, or if it was, that it was an immaterial one. There is no necessity for discussing this question. The complaint in one of its paragraphs specifically averred that upon the line of railroad where the accident happened the defendant was maintaining and operating a

steam railroad and was owner of the track and rolling-stock and other appurtenances belonging to it. As to this allegation the answer simply denied that at any time, or at all, said defendant was maintaining or operating any steam railroad. There was no denial of the ownership of the track and rolling-stock of said railroad as alleged, and while it is true there was no direct evidence that the defendant was operating the particular train occasioning the accident, still the admitted fact that it owned the track and rolling-stock appurtenant to it was sufficient evidence, in the absence of anything to the contrary, from which a proper and reasonable inference might be drawn by the jury that such train was at the time being operated by defendant. The rule is that where it is shown, or is admitted, as it was by the pleadings, that a corporation was the owner of a railroad in the operation of which a wrong was committed, the presumption is that the road was in its possession and being operated by it at that time. (*Ferguson* v. *Wisconsin Central Ry. Co.,* 63 Wis. 145, [23 N. W. 123]; *Walsh* v. *Missouri Pac. Ry. Co.,* 102 Mo. 582, [14 S. W. 873, 15 S. W. 757]; *Peabody* v. *Oregon etc. Ry. Co.,* 21 Or. 121, [26 Pac. 1053].)

At the close of the evidence, counsel for appellant moved the court for the same reason as just considered, to instruct the jury to return a verdict for defendant, which was denied.

This motion was based upon certain evidence submitted by the defendant in making out its defense, under which it was claimed that another corporation, known as the Southern Pacific Company of Kentucky, and not the defendant, the Southern Pacific Railroad Company, was liable to plaintiffs for any injury which they may have sustained.

A lease was introduced in evidence dated February 10, 1885, made by the defendant, a California corporation, to the Southern Pacific Company of Kentucky, as authorized under an act of the legislature. (Stats. 1880, p. 21.) In this instrument the defendant leased to the Southern Pacific Company for ninety-nine years "all of its railroad situated in the state of California, known and' designated as the Southern Pacific Railroad of California, with all its branches and all railroads now leased under it, together with the rolling-stock, telegraph poles, tools and property of every kind and nature whatsoever, now in use upon or in connection with said rail-

CLIV Cal.—19

road, together with all the appurtenances thereunto belonging, with the right to possess, maintain, use and operate the said property, and to receive the rents, issues and profits thereof." In the lease the Southern Pacific Company agreed that it would "keep the said leased property in good order and condition and repair, operate, maintain, add to and better the same at its own expense," and at the termination of the lease, to return it, with the additions and betterments, in as good condition and repair as at the date of the lease.

These constituted the terms of the lease, but it is apparent from them, taken in connection with other evidence relative to that part of the railroad upon which the accident took place, that as to it, this lease could avail the defendant nothing. In 1886, a year subsequent to the making of the lease, a corporation was organized, known as the Southern Pacific Branch Railway Company, for the purpose of constructing a railroad from Saugus, in Los Angeles County, to Ellwood, in Santa Barbara County, and which it completed in 1886-7. In 1888 the said Southern Pacific Branch Railway Company was, with divers other railroad corporations, consolidated into the Southern Pacific Railroad Company under the latter name. That part of the road on which the accident occurred was a change in, or addition to, the road constructed by the Southern Pacific Branch Railway Company, and not to any road owned or leased, or in existence when the lease to the Southern Pacific Company was made by this defendant.

The contention of appellant is that the lease included the railroad where the accident occurred, as well as the Southern Pacific Branch Railway, the road of which it was a part. But the lease is not capable of that construction. It makes no reference to future acquired railroads. There is no doubt or ambiguity in the language used in it; nothing equivocal in its terms. It clearly and plainly speaks of the property leased under it as railroad property of the date of the lease, known as the Southern Pacific Railroad of California, with all its branches and all railroads now leased by it, together with its personal property now in use in connection with said railroads. It clearly speaks in the present tense and as of the date of the lease.

This langauge is clear and explicit and in no respect equivocal, and must govern the interpretation of the lease. (Civ.

Code, sec. 1638.) It limited the property leased to that owned by the Southern Pacific Railroad Company at its date, and there is no warrant for extending its terms by construction so as to include subsequently acquired railroad property.

And that only the roads and their equipment owned when the lease was made were intended to be leased is apparent not only from its terms, but from the conduct of the parties under it. It is provided in the lease that the Southern Pacific Company, the lessor "shall add to and better the same (the leased property) at its own expense." It is shown in the evidence that after the lease was made, the Southern Pacific Company made changes in the new lines constructed through Santa Barbara County, of which the portion of the road where the accident occurred is a part, and charged the cost of such construction to the lessor, the Southern Pacific Railroad Company. If the parties were acting under the lease of 1885, this cost, under its provisions, would have been borne by the Southern Pacific Company as lessee and not by the Southern Pacific Railroad Company, as lessor. While the lease of 1885 speaks of betterments which may be made by the Southern Pacific Company as lessee, the change which was being made in the road upon which the accident occurred was not in the nature of a betterment under the lease. The change was an improvement, not being made on any road which was embraced in the lease, but upon one which was not included in it. (See Betterments, 4 Am. & Eng. Ency. of Law, p. 7; 5 Cyc., p. 684.)

It is insisted, however, that if the lease of 1885 did not embrace this subsequently constructed road, there was sufficient evidence to sustain an implied lease of it from the defendant to the Southern Pacific Company, as also sufficient evidence to establish a parol lease. The only testimony for which support in either of these positions can be claimed is that of C. P. Lincoln, assistant secretary of the defendant, who testified that the Southern Pacific Company was operating the roads all down in the locality where the accident happened. He identified the lease of 1885 and testified on direct examination that the line changes as made were turned into the operating company—the Southern Pacific Company—under that lease, and that this latter company was operating those lines and accounting for the profits under that lease. On

cross-examination he stated he reached his conclusion in rela-·tion to that matter from the lease itself and by seeing the distribution of profits from year to year, and making entries thereof in the books of the company; that he inferred from his knowledge of the lease of 1885 and these entries that the Southern Pacific Company was operating all of the line under that lease and that this was the entire source of his information. He testified also as additional information on the subject that the annual report of the Southern Pacific Company showed the lines leased by the Southern Pacific Company, and in that showing appeared the Southern Pacific Railroad as one of its leased lines; that is, an addition; that from that report and the entries in his books and inspection of the lease he drew the conclusion that all these new roads were new additions to the main road and were operated under the lease.

It is apparent that the testimony of this witness was directed to the lease of 1885, and amounted simply to a conclusion on his part that the lease embraced all roads, including the premises in question, acquired by the Southern Pacific Railroad Company subsequent to the making of the lease, as well as those owned by that company at the date of the lease. This testimony had no tendency to prove an implied contract of lease, but amounted only to an inference on the part of the witness from the data which he had in the office of the company that these subsequently built or acquired roads were embraced in the lease of 1885. This testimony, however, was incompetent and ineffectual for that purpose. The lease was clear and plain to the point that only railroads owned by the Southern Pacific Railroad Company at its date were embraced in it, and this being true, it was not permissible, and the evidence was incompetent to extend the terms of the lease by parol evidence so as to embrace the subsequently acquired roads in it. (*Philadelphia Elec. R. R. Co.* v. *Trimble,* 10 Wall. 367; *Norris* v. *Kettle,* 57 N. J. L. 218, [30 Atl. 879]; *Ralya* v. *Atkins,* 157 Ind. 331, [61 N. E. 726]; *Holston* v. *Campbell,* 89 Va. 396, [16 S. E. 274]; Devlin on Deeds, sec. 840.)

Neither did this evidence prove an oral lease. There was nothing to show that any negotiations were entered into relative to such a lease. No action of the officers of either cor-

poration to that end is shown, or the terms of any such lease. Aside from the lease of 1885, which we have seen did not embrace the road in question, there is only the evidence of the witness Lincoln upon which any claim of a parol lease can be based. But all this witness testified to was that the Southern Pacific Company operated the roads and accounted for the profits. This, however, did not establish a parol lease, because such operation would be consistent with other conventional relations aside from leasing; it would be equally consistent with the relation of principal and agent or employer and employee or with the existence of a trackage contract or a mere license.

In this country it is the accepted doctrine and general rule that as a railroad company receives a public franchise involving the discharge of great public duties and entailing responsibilities to the public, among other things, in the operation of its road, it cannot escape responsibility or avoid the discharge of the duties and obligations imposed under its franchise by voluntarily leasing its road to be operated by another company. It can only relieve itself from responsibility for injuries resulting from such operation by showing a lease made to the operating company under statutory authority. (1 Elliott on Railroads, 2d ed., secs. 427 et seq.; *Gulf C. & S. R. R. Co.* v. *Miller,* 98 Tex. 270, [83 S. W. 182]; *Singleton* v. *Southwestern R. R. Co.,* 70 Ga. 464, [48 Am. Rep. 574]; *Abbott* v. *Johnstown etc. R. R. Co.,* 80 N. Y. 27, [36 Am. Rep. 572]; *Railroad Co.* v. *Brown,* 84 U. S. 45; *Thomas* v. *Railroad Co.,* 101 U. S. 71.)

Legislative authority exists in this state under the act of 1880 referred to whereby a corporation may lease its railroad property to another company and will be relieved from personal liability for an injury resulting merely from the negligent operation and handling of trains by the lessee. (*Lee* v. *Southern Pacific R. R. Co.,* 116 Cal. 97, [47 Pac. 932].)

Relief from such liability, however, only exists where there is proof of a lease made as provided in the act, and it was the duty of the defendant to bring itself within the terms of the exemption under the act by showing such a lease. This it did not do. As we have heretofore said, a corporation shown to be the owner of a railroad is presumed to be in actual possession and operation of it, and this presumption is not

repelled by proof merely that some other company at the time of an accident resulting from its operation was operating cars over it. Under the presumption the burden is upon the owner to show, when the question of liability for injury by moving cars arises, that the cars which inflicted the injury were under the control and operation of some other company by virtue of the lease of the road. The portion of the road here in question was not embraced in the lease of 1885; there was no proof of an implied lease, or an oral lease, and the presumption from the ownership of the road by it being, that the operation of the cars of any other company over it was permitted under some contractual arrangement or relation other than a lease which, under the statute, could alone relieve it from liability for the injury complained of, the motion of defendant to have the court instruct the jury to return a verdict in defendant's favor on the ground that if any responsibility existed, it was that of the Southern Pacific Company, was properly denied.

The court in one of its instructions stated to the jury that the defendant by its answer admitted that its train approached and passed over the bridge, but denied that it was negligent in its management. Appellant claims that this was error, because it insists that the answer raised an issue as to whether appellant caused this, or any train, to approach the crossing. It is very doubtful whether any such issue was raised by the pleadings, but assuming that it was, we do not think the verdict should be disturbed because of the instruction. We cannot see how appellant could be injuriously affected under the evidence by giving it. As the defendant was the admitted owner of the road and the rolling-stock being operated on it, it was responsible in law for any accident occasioned by such operation by any other company, unless it could establish that such other company was operating the road under a lease as provided in the act of 1880. It did not establish it, and in the absence of proof of a lease the defendant was in law responsible for the operation of any train over its track; for all purposes of responsibility any train operated over the road was its train, even though operated by another company. (*Singleton* v. *Southwestern R. R. Co.,* 70 Ga. 464, [48 Am. Rep. 574]; *Abbott* v. *Johnstown etc. R. R. Co.,* 80 N. Y. 27, [36 Am. Rep. 572].) Under these circumstances, it would

not have been error on the part of the court to have stated
to the jury directly that the defendant was in law liable for
any injury occasioned by the operation of the train, provided
they found that it was being operated carelessly and negli-
gently in approaching the crossing as alleged in the complaint,
and it was not shown that the deceased had been guilty of
contributory negligence.   In this view, even conceding that
it was not proper according to appellant's theory of the plead-
ings for the court to instruct the jury that the defendant
admitted that its train approached the crossing, still as in
the absence of proof of a lease of its road to any other com-
pany which was operating its cars over the road, defendant
was as fully liable for any injury occasioned by such oper-
ation as if it were itself actually running the cars, the error
was of no consequence.

It is claimed that the court should have instructed the jury
on the motion of defendant to return a verdict in its favor
upon the ground that the evidence showed that the deceased
was guilty of contributory negligence.

The right of a defendant to have a jury so instructed can
only obtain where the evidence conclusively establishes such
negligence.   It is only where no fact is left in doubt, and no
deduction or inference other than negligence can be drawn
by the jury from the evidence, that the court can say as a
matter of law that contributory negligence is established.
Even where the facts are undisputed, if reasonable minds
might draw different conclusions upon the question of negli-
gence, the question is one of fact for the jury.   (*Seller* v.
*Market St. Ry. Co.*, 139 Cal. 268, [72 Pac. 1006].)

Referring somewhat to the evidence in the case at bar:
The theory of the appellant is that by reason of certain meas-
urements made by the witnesses and from observations made
by them as to the points along Hollister Avenue traveled by
Olin Johnson and his mother, from which a train approach-
ing the crossing was visible, and taking into consideration
respectively the gait at which the horse was going and the rate
of speed at which the railroad train was approaching the
crossing, it conclusively appeared that neither the deceased
nor her son looked for the train.   It is reasoned therefrom
that if they had looked they could have seen the train ap-
proaching, and as they did not see it, they must, therefore,

not have looked. But the facts upon which this theory is based are not so definitely and exactly fixed as to warrant the deduction as a matter of law. The observations of the witnesses of defendant were made some four and a half years after the accident, and the physical condition of things along the plane of observation from Hollister Avenue to the railroad track was different from what it was at the time of the accident. Aside from the fact that at several points along Hollister Avenue it was obstructed by trees, the evidence shows that at a point on the avenue one hundred and fifty feet west of the crossing the view of the railroad track was obstructed by a large growth of tall mustard on a knoll, so that approaching trains could not be seen further than a distance of three hundred feet at that point on the avenue. As to the gait of the horse and the rate of speed of the train, these are indefinite—the horse was jogging along *probably* five miles an hour, the train running *about* fifteen miles an hour. The evidence of the plaintiff Olin Johnson is that both he and his mother were familiar with the crossing, and the latter nervous about approaching it; that they stopped, looked and listened for the train at a point on Hollister Avenue, heretofore referred to, and saw or heard none; that his mother cautioned him to drive slowly; that he did so, both of them repeatedly looking and listening for the train, but saw or heard nothing of it, until as he drove under the crossing, the noise of its approach frightened the horse and resulted in the death of his mother. The testimony of the fireman of the train (the engineer had died before the trial) was that he saw the horse running from under the bridge as the train passed over it. The testimony of several witnesses driving easterly and westerly under the crossing at the time the accident happened, and who were as favorably situated as the Johnsons for seeing the train and looked to see if it was approaching, was that at that time there was no train in sight. The fireman testified that the train was moving down grade at about fifteen miles an hour. This was but an estimate on his part, given years after the accident. It is a rule of physics that the momentum of bodies increases as they proceed down an inclined plane, and the jury might have well taken this rule into consideration in connection with the testimony of plaintiffs and their witnesses in determining whether in approaching the crossing on a

down grade the speed of the train was not greater than fifteen miles an hour. If the speed was greater, the observations of the witnesses for defendant that the train could be seen at points along the track from stations on Hollister Avenue, being based on a speed of fifteen miles an hour, would become unimportant, as at the greater speed the train would not be in sight, when at the lesser speed, and from their points of observation, it might be visible. It is to be noted, too, that the observations made by the witnesses for defendant did not take into calculation the large growth of mustard—upwards of five feet in height—upon the knoll as it existed when the accident occurred. It was not there when they made their observations. The evidence shows that this growth obstructed a view beyond three hundred feet down the track at a point one hundred and fifty feet on Hollister Avenue from the crossing. The jury had before them the testimony of plaintiff Olin Johnson and the other witnesses in behalf of plaintiff that they looked as they approached the crossing and saw no train in sight; the testimony of the fireman that as the train crossed, the horse galloped from under the bridge; the obstruction of the mustard growth to observation by the Johnsons, and the indefinite evidence as to the speed of the train and the down grade. The jury had the right to accept the testimony of the witnesses for the plaintiff, and the other circumstances referred to, and to draw such inferences therefrom as they reasonably warranted. It cannot be said it was an unreasonable inference for them to draw, that the train approached the crossing at a greater rate of speed than fifteen miles an hour, and that this fact, with the growth of mustard obstructing their view of the track as they reached the crossing, prevented the Johnsons from seeing the train at any point when it would be in sight according to the observation of the witnesses of defendant based on a speed of fifteen miles an hour, and when they could have checked their further approach to the crossing or turned back to avoid danger. The condition of the evidence was such that the jury had a right to draw this inference, and, hence, it was proper for the court to refuse to take the case from them.

Appellant complains of an instruction to the jury as to the elements of damage recoverable by the plaintiffs. The court instructed the jury that the husband was entitled to

recover the value of the present and future services of the "wife and companion," and the children the value of the mother's "nurture and instruction, moral and physical, and intellectual training"; that they "must award such a lump sum for damages as will fully compensate the plaintiffs, both the husband and children, for the pecuniary value to them of the life of the wife and mother."

Appellant's criticism of this instruction is that under it the jury were to take into consideration losses in common to all the plaintiffs; that the services, for the loss of which the children were entitled to recover, were obviously different from those for which the husband might recover, and that the damages intended by the statute to be recoverable are damages common to all the plaintiffs and do not include parental care, and it was error for the court to instruct the jury that they might include in their verdict the value to the children of their mother's "nurture and instruction, moral and physical, and intellectual training." We state the position of appellant to say that the settled law of the state is against it. Just such an instruction, as is here criticised, was before the court in *Redfield* v. *Oakland C. S. Ry. Co.,* 110 Cal. 285, [42 Pac. 822, 1063]. It was there held that in the statutory action of this character, the children had a right to recover for the loss of such services as the trial court in this case specifically indicated they might, and as services distinct from those for the loss of which the husband might recover. This makes further discussion of appellant's point on the instruction unnecessary.

Several other grounds are advanced for a reversal, which, however, we deem untenable.

The judgment and order appealed from are affirmed.

Henshaw, J., and Angellotti, J., concurred.

Hearing in Bank denied.